IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL PIERCE<br>Maine State Bar #005917<br>45020 Aviation Dr. #128<br>Dulles, VA 20166<br>　　　　Plaintiff,<br>*Individually and On Behalf of a Proposed Class*<br>*of Similarly Situated Individuals*<br><br>vs.<br><br>YALE UNIVERSITY<br>206 Elm Street<br>New Haven, CT 06520<br><br>THE TRUSTEES OF THE<br>UNIVERSITY OF PENNSYLVANIA<br>3401 Walnut Street<br>Philadelphia, PA 19104<br><br>and<br><br>AMERICAN ASSOC. OF MEDICAL COLLEGES<br>655 K Street NW<br>Washington, DC 20001<br><br>　　　　Defendants. | Case: 1:17-cv-02508           (F-Deck)<br>Assigned To : Cooper, Christopher R.<br>Assign. Date : 11/20/2017<br>Description: Pro Se Gen. Civil   Jury Demand<br><br>CLASS ACTION COMPLAINT<br>COMPLAINT FOR PERMANENT<br>INJUNCTION<br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.　　Defendants American Association of Medical Colleges ("AAMC"), the Trustees of the University of Pennsylvania ("Penn"), Yale Universiy ("Yale"), and their co-conspirators have colluded to restrain trade in a manner prohibited under Section 1 of the Sherman Act by:

2.　　Agreeing to require applicants to pay a nonrefundable fee collected by the AAMC ostensibly for distribution of biographic information to each school to which an applicant considers applying in order to receive individual schools' actual applications. Such tying serves no legitimate purpose; rather, its sole purpose is to unjustly enrich the defendants. In fact, the

1

AAMC is realizing outrageous and exorbitant profits through this scheme. Law schools, in contrast, do not charge a fee merely for receiving an individual school's application, and it is not possible for a law school applicant to pay for an application unless and until it is complete. The named Plaintiff and a class of similarly situated individuals suffered identical losses - approximately $40 per occurrence for a service that was in each case entirely worthless - so class-wide relief is appropriate on this claim.

3.     Agreeing to share the names of accepted applicants among competing medical schools in order to limit the overall number of acceptances, reduce class sizes, improve bargaining power in financial aid negotiations, control the composition of the buyers of the service and otherwise unreasonably injure the market for medical education in the United States. No two applicants' injuries due to the information sharing are alike, and so this claim is made individually. Named Plaintiff Samuel Pierce, a magna cum laude graduate of Penn's undergraduate program who earned perfect scores on the Medical College Admissions Test, was one of approximately 700 people selected by Yale for an interview in New Haven out of a pool of approximately 5000 applicants on the basis of the biographic information, including Medical College Admissions Test scores, distributed to Yale by the AAMC as described in the paragraph above. If not for the unreasonable agreement to share the names of accepted applicants with Defendant Penn and other co-conspirators, Yale would have had to admit him in order to fill its class.

## PARTIES

4.     Samuel Pierce is an individual residing in the State of Virginia.

5.     The Association of American Medical Colleges is a not-for-profit corporation with a principal place of business at 655 K Street, NW, Washington, D.C. 20001.

6.     Yale University is a not-for-profit corporation with a principal place of business at 206

2

Elm Street, New Haven, CT 06520.

7. The Trustees of the University of Pennsylvania is a not-for-profit corporation with a principal place of business at 3401 Walnut Street, Philadelphia, PA 19104.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. §1331 because this cases arises under federal law. It poses purely federal questions under §1 of the Sherman Act.

9. This Court has personal jurisdiction over Defendant AAMC because it has its principal place of business in the District of Columbia. This Court has personal jurisdiction over Yale and Penn under the conspiracy theory of this Court's personal jurisdiction articulated in Jung v. AAMC because the Defendants have each committed multiple overt acts in furtherance of the alleged conspiracy in this judicial district including, but not limited to:

10. The mailing of the Plaintiff's transcript by Defendant Penn from Penn's campus in Philadelphia to the Post Office Box in the District of Columbia maintained by the AAMC.

11. The collection of application-related fees in the District of Columbia by the AAMC on behalf of its economic beneficiaries including the other two defendants.

12. The transmission to the District of Columbia of the names of students accepted at each of Defendants' medical schools for further processing in the District of Columbia and eventual distribution from the District of Columbia to the other medical schools.

13. The planning, management, design, and coordination of the operation of the American Medical School Application System occurring primarily within the District of Columbia at the AAMC offices.

14. Venue is appropriate in this district under 28 U.S.C. §1331(b) because a substantial portion of the events giving rise to the claim occurred in this district, as described in the

preceding paragraphs.

## Factual Allegations

A. <u>Market Power in the United States Medical Education Market</u>

15. The AAMC's 2013-2014 annual report understates the true scope of its domination of the medical education market in the United States when it admits that most medical schools use the American Medical College Application System. In fact, every medical school in the United States except for those operated by state universities in Texas and North Dakota utilize the American Medical College Application System.

16. The AAMC's 2013-2014 annual report shows it made an operating profit of $18 million on $180 million of revenues from what it refers to as its service programs, which include the Medical College Admission Test and AMCAS.

17. There are no adequate alternatives to U.S. medical education in either a geographic or a product sense. Medical education outside the United States and/or other health science educational programs such as those for nurse practitioners, dentists, veterinarians, or osteopaths is so significantly different considering skills taught, educational methods, and qualifications gained that they are completely distinct geographic and product markets.

B. <u>The Evolution of Transcript Assembly Services & The Rise of The Class Claim</u>

18. The internet age offered a new opportunity for the competing providers of education services to band together as a cartel to enrich themselves. They could have students type their biographical information on a webpage, and charge an exorbitant fee for dissemination to members of the cartel. All they need to do is make payment of the fee they charge for dissemination - an essentially zero-cost service - a mandatory condition of

4

receiving some particular educational benefit.

19. Law schools and medical schools adopted just such a scheme when the agreed to have students submit their academic and biographic information to a central, mostly electronic distribution center, which then charges a fee to students before they can begin the process of applying to law or medical school.

20. The transcript assembly services operated by the trade associations for competing graduate schools are inherently suspect. Private businesses such as Iron Mountain and many others in the document storage and delivery business could arrange for dissemination of applicant undergraduate transcripts for a tiny fraction of the cost charged by medical schools and law schools. In the AAMC's case, the cost to students is more than four times as high as what Penn charges to mail a transcript.

21. Penn and Yale agreed, through the AAMC and in concert with other co-conspirators, as follows: A student who decided to apply to those 2 medical schools would need to pay approximately $250 to distribute biographic information to Penn and Yale before being given the actual application to each school. For the sum of $10, the Plaintiff could have mailed his Penn transcript to Yale and Penn officials could have viewed the Plaintiff's data on Penn's system of student records at no cost to anyone.

22. Of the $250 described in the preceding paragraph, about $170 was considered the base fee for the AAMC processing the Plaintiff's transcript sent by Penn to the AAMC, plus the $40 fee for the electronic distribution of the biographic information to each school.

23. The additional cost for the AAMC in the distribution of a student's biographic information to a member school, a single 1-10 MB transmission of data, is only a few cents.

24. The fee for the distribution of a student's biographic information as described in the

preceding paragraphs is designed primarily as a penalty designed to discourage a student from filling out "too many" applications, and the AAMC does not even pretend that the fee for distribution approximates the marginal cost or any cost of the service.

25.     Essentially the transcript assembly service's value if any consists of stripping the brand name from a student's transcript. While its egalitarian aims in theory might not be entirely indefensible, it is just another opportunity for medical schools to apply a biased rubric to discriminate based on race. The entire process ignores the fact that at different higher educational institutions the educational experience varies substantially. In fact, the named plaintiff's alma mater, Penn, has consistently ranked first in faculty resources for example as calculated by the U.S. News and World Report, a measure of the overall access to top faculty for undergraduate students.

26.     Of course, medical schools do consider institution quality, but like all of their admissions criteria, their evaluation admittedly differs subjectively based on the applicant's race.

27.     Medical schools will publicly admit they consider institution quality, and they are doing it in a subjective manner so as to further their objectives. The fact that medical schools are still going to consider the name of the institution at the top of a standardized page with the AMCAS logo means the entire translation process of student academic data from university issued transcript to AMCAS standardized format is of little or no real value.

28.     The AAMC takes the questionable practices of transcript assembly services to an abusive extreme. Medical schools have agreed that before a student may even view the application to an individual school, a student must pay a fee to have their standardized transcript as described in the preceding paragraph sent by the AAMC to the medical

school. In the named plaintiff's case, he frequently found after paying to view a medical school's application that its questions and formats were so onerous and different from other medical schools' that it was not feasible to complete the application, and so the named plaintiff's $40 for the transcript electronically delivered to the medical school was lost without the name plaintiff even having submitted an application to that school.

29. It is a stretch too far to say that the AAMC's exorbitant marginal profit on the practice described in the preceding paragraph is justified by the need to fund its other operations, including, inter alia, lobbying governmental officials to impose higher rates of taxation in order to increase the funding available for publicly-financed healthcare - i.e., that promotion of the side the AAMC has taken on this ideologically divisive issue is such an overwhelming public good that it justifies forcing aspiring medical students to subsidize it.

30. No other legitimate procompetitive exist to justify the practice described in the preceding paragraphs, and many less restrictive alternatives exist in any event. Like law schools, medical schools could simply postpone charging students to distribute the standardized transcript until students had a chance to review the actual application, or medical schools could refund students who decided not to submit the application to a particular school the fee paid for the distribution of their biographic information to that school.

31. The Defendants could attempt some other argument that the AMCAS system is somehow logistically convenient in the context of the entire scheme they devised, but it is not likely to be persuasive. Whether it might be easier from an information technology perspective is not determinative in allowing competitors to agree to charge a fee for the application before it is sent to the applicant.

32. During the time the Plaintiff submitted applications each year to medical school through the AMCAS system from 2009 until 2015, the Plaintiff found on numerous occasions once having paid the AAMC a fee for distribution of his biographic information to a particular school that the school's application's format, questions, and/or other requirements made it infeasible to complete.

33. The Plaintiff did on numerous occasions during the period 2009-2015 lose the sum of money paid to the AAMC for distribution of his biographic information without receiving anything of actual value in return because his application was never completed and thus never considered by the medical school receiving the Plaintiff's biographic information.

## CLASS ACTION ALLEGATIONS

34. Class adjudication of the claim for damages for the unreasonable tying of the AMCAS service to individual schools' applications is appropriate under Federal Rule of Civil Procedure 23 because:

35. Adequate Definition. The class can be defined as all prospective medical students who applied through the AMCAS system during the years 2009 to 2015 and paid AMCAS distribution fees for particular schools to which they never completed fee payments for the schools' actual applications.

36. Ascertainability. Class members can be ascertained via comparison of AMCAS payment data with individual schools' payment data.

37. Numerosity. Of the more than 50,000 individuals submitting applications each year through AMCAS, a substantial portion of them paid AMCAS distribution fees for particular schools to which they never completed fee payments for the schools' actual applications.

8

38. Commonality. The question of law is common to the entire class and the factual question is for each class member is the same: whether they paid the AMCAS fee and the school fee.

39. Typicality. The Plaintiff is typical of a class member, all of whose claims arise from having paid to send their information to a particular school in order to review the application for that school.

40. Adequacy. The Plaintiff will adequately represent the interests of class members because his interest like theirs is receiving back the money he lost on the AMCAS fees paid for distribution of his information to schools to which he never applied.

C. <u>The Anti-Competitive Effects of Sharing the Names of Accepted Students</u>

41. When the AAMC instituted a policy in the middle of the named Plaintiff's run of unsuccessful medical school applications that all AAMC members would share the names of admitted students on May 1 of each year, it was a problem in search of a solution.

42. There are two reasons Defendants adopted a policy that they would share the names of accepted students :

43. First, They wanted to limit capacity by avoiding the capital planning necessary to accommodate extra students in the event more accepted students enrolled than anticipated, and

44. Second,. They wanted to ensure the composition of the class, largely defined in racial terms, best suited the desires of the medical schools, who openly admit they are using race in admissions in the Supreme Court of the United States..

45. The information sharing serves to lessen the overall number of acceptances offered, because medical schools know if an accepted student is also considering another medical school. The increased precision in limiting the size of a medical school's entering class causes

9

medical schools to also avoid investment in medical school capacity, because they don't have the plan for the possibility that more students will enroll than expected.

46.  The information sharing agreement medical schools adopted is also designed to raise effective prices paid for tuition, because by sharing the names of accepted students, medical schools avoid having to increase financial aid awards, effectively tuition discounts, to particular students an an additional measure to increase the probability of particular students enrolling and reduce the class size and composition uncertainty.

47.  If Yale weren't certain of whether one of the other students interviewed on the same day as the name plaintiff it admitted were also holding an admission at Penn, Yale would have had to offer more students it interviewed places in the entering class, including the plaintiff.

48.  Claims that quality of a product or service is higher if produced in smaller batches are highly dubious in the context of agreements among competitors to limit output.  There is little or no evidence that overall class size is a determinant of the quality of medical education. There is no other legitimate reason to share the names of accepted students among schools.  Use of race-based "affirmative action" to achieve "critical mass" is at best permissive under federal law; it is certainly not mandatory, as *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. ___ (2014) holds.

49.  Any argument that sharing the names of accepted students by the Defendants is necessary to ensure all spaces are filled should quickly fail because the less restrictive, pro-competitive alternative of sending out more acceptances is plainly available.

50.  Medical school classes are small, so the margin of error for ensuring a "critical mass" of a particular race is accordingly small as well.  If not for an information sharing program, medical schools might fail to enroll a "critical mass" of a particular racial group or even a single member of a particular racial group.

51.     If the 20 Black students accepted at Yale in a given year are each holding 9 other acceptances, Yale might expect to enroll 2, but it would have a 12% probability of enrolling zero, assuming each applicant is equally likely to choose from among each of the 10 schools to which he or she is accepted, according to the binomial probability tables. This is the problem Yale, Penn, and other medical schools are trying to address by sharing the names of accepted students with each other.

52.     As "N" the number of students enrolled in particular educational program becomes small, a "critical mass" and a quota become mathematically indistinguishable. In a program as small as Yale's medical school, where there are fewer than 100 students enrolling each year, "critical mass" and quota are one and the same.

53.     If Yale has accepted several Black applicants, in the absence of the information sharing, Yale would not know whether those students are also accepted at Penn. Yale's options would be to either further contort the definition of merit to an even sillier extreme in order to justify admitting additional Black students - also injuring its other goal of limiting output and raising price – or take the risk that it might not hit its quota of Black students in the entering class.

54.     Statistics released by the AAMC show that for a given MCAT score, a Black applicant is far more likely to be admitted to medical school than a White applicant. This trend holds true at Defendants Penn and Yale.

55.     As a remedial matter, an argument by Yale that, in the absence of the conspiracy to share the names of accepted students, it would have admitted more Black students rather than admit the Plaintiff should be unavailing, as should any argument by Yale that they would not have admitted the Plaintiff regardless of the information sharing with Penn and other co-conspirators.

56.     Taking Yale's own assessment of the Plaintiff's relative rank following his interview

and using that as the lodestar to determine whether the magnitude of the market impact proved by Plaintiff would have been enough for him to be offered an acceptance in a market free from unreasonable restraints on competition is not the right approach to decide whether an injunction should issue requiring Yale to admit the Plaintiff, because Yale's own rankings offend public policy and are not binding on a court sitting in equity trying to fashion relief in this case.

57. The actions in furtherance of what is defendants' primary justification for these highly restrictive restaurants - the need to precisely control the composition of the entering class to achieve the thinly veiled, rigid racial quotas they utilize - could also be understood as an unlawful group boycott. For even if the diversity pursuit is allowed under title vi and the us constitution, that does not mean it is required! Cf. Justice Scalia's perplexed question in *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. ___(2014), "Does the Equal Protection Clause of the Fourteenth Amendment *forbid* what its text plainly *requires*?" (Slip. Op. at 27 (Scalia, J., concurring)).

58. If racial diversity is merely a permissible aim for schools in admissions, one towards which federal law is at best lukewarm, then market allocations of black students as described are surely not required of educational institutions, and even the coordination necessary to agree that all medical schools would use race in admissions and retain counsel for declaring the same in the Supreme Court of United States is unlawful.

59. A separate admissions track applied to the Plaintiff where the Plaintiff was expected to produce incontrovertible evidence that he had no inklings of support for the Republican Party or any ideas associated with it, which did not apply to any Black applicants.

60. Yale made advocacy in favor of the Affordable Care Act, a federal law imposing taxes on higher-income Americans and providing for subsidization of health care for lower-income Americans, a mandatory aspect of its medical school curriculum. Yale's official website for its

medical school proudly announces: "Students, residents, and faculty at the School of Medicine joined hands Monday in a line that stretched almost the length of Cedar Street, in a show of support for the Affordable Care Act (ACA). The act, also known as Obamacare, is under attack from President Donald Trump and Republicans in Congress who want to repeal it."

61. The Monday in question was a regular day of business for Yale University, and the activities described in the preceding paragraph occurred during daylight hours as part of the normal, university-sanctioned educational program at the medical school.

62. Five other articles on Yale's website describe similar activities, required of medical students, to show their affection for the ACA and public financing for health care more generally, as well as opposition to other elements of the Republican agenda.

63. Among the ways in which Yale invidiously discriminates is a de facto requirement, not applicable to Black and Hispanic applicants (who are assumed to share Yale's required ideology), that White applicants disprove by incontrovertible evidence any allegiance to the Republican Party

64. The ways in which Yale is using and conspiring to use race does not constitute a legitimate attempt at increasing diversity in the classroom because it is designed to achieve precisely the opposite objective. Yale's use of race in its admissions process serves in fact to exclude those like the Plaintiff who Yale determines on the basis of evidence available to it, principally skin color and last name, will not join hands on Cedar Street in support of the Affordable Care Act. Yale used racial stereotypes to ensure ideological homogeneity among the incoming class to which the Plaintiff applied.

65. Race based policies are subject to scrutiny that requires that the diversity goal be genuine and medical schools' – particularly Yale's- simply aren't.

66. A court sitting in equity to determine the propriety of injunctive relief should consider

13

Yale's efforts to stack the deck against persons of Plaintiff's race and evaluate Plaintiff's qualifications using objective metrics like the Medical College Admissions Test instead of Yale's after the fact, self-serving ranking of the Plaintiff among the approximately 400 of the 700 interviewed students who were not offered admission.

67. Plaintiff scored perfect 15s on a scale of 1-15 in both the Physical Sciences (99.9-99.9th Percentile) and the Biological Sciences (99.5-99.9th Percentile) portions of the Medical College Admissions Test, and there were fewer than 160 prospective medical students who scored as well or better than Plaintiff on the MCAT in 2009 as measured by total score. The Plaintiff then scored a perfect 15 *again* in 2012 on the Biological Sciences en route to a second overall MCAT score above the 99th percentile.

68. It's hard not to appreciate the irony that AAMC members are negatively responding to outstanding performance on the Medical College Admissions Test, an exam they charged an exorbitant amount of money to take and represented was an excellent predictor of success in medical school! But the Court should not take a similar approach and should look at the hard numbers to determine the equities weigh heavily in favor of requiring Yale to admit the Plaintiff to medical school.

### COUNT I (AGAINST ALL DEFENDANTS)
### CLASS ACTION CLAIM
### Violation of §1 of the Sherman Act: Unreasonable Restraint of Trade
### Unreasonable Tying of School Application to AMCAS Distribution Fee

69. Plaintiff realleges and incorporates herein the allegations in Paragraphs 1-85, inclusive.

70. A class meeting the requirements under the Federal Rules of Civil Procedure can be defined as all prospective medical students who applied through the AMCAS system during the years 2009 to 2015 and paid AMCAS distribution fees for particular schools to which they

14

never completed fee payments for the schools' actual applications.

71. Defendants' scheme fails the "rule of reason" antitrust analysis, as its anticompetitive effects substantially outweigh any alleged procompetitive effects that may be offered by Defendants, including that their collusive conduct is justified by the need to cover its costs or deter students from submitting "too many" applications.

72. Reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices, including refunding distribution fees incurred for a particular school when students decide not to apply to that medical school or refraining from charging a distribution fee until the time the school's actual application is submitted as is the more reasonable practice of the Law School Admissions Council.

73. Expert analysis will demonstrate the devastating effects these restraints have caused in the market for medical education in the United States.

74. Plaintiff is entitled to receive all appropriate injunctive relief.

75. As a direct and proximate result of Defendants' scheme, Plaintiff and the other members of the Class have been injured and financially damaged in amounts which are presently undetermined but can be easily ascertained through discovery of Defendants' financial records.

76. Defendants' actions are solely to enhance revenue for themselves and their co-conspirators.

77. Plaintiff is entitled to recover from the Defendants treble the damages, including attorneys' fees, he has sustained and will sustain, and any gains, profits and advantages obtained by Defendants.

78. The Defendants are jointly and severally liable for all damages incurred by the class.

## COUNT II (AGAINST DEFENDANT YALE)
### INDIVIDUAL CLAIM
**Violation of §1 of the Sherman Act: Unreasonable Restraint of Trade**
**Unreasonable Agreement to Share Names of Accepted Students**

79. Plaintiff realleges and incorporates herein the allegations in Paragraphs 1-85, inclusive.

80. The Defendants have entered into a continuing contract, combination, and conspiracy in restraint of trade to artificially inflate and fix the effective prices paid for medical education, by sharing the names of accepted students so as to limit the incentive to secure student commitments through more attractive financial aid packages.

81. Defendants' and their co-conspirators' cartel has collectively conspired to limit the total number of acceptances offered by each school in such a manner as to illegally limit output of medical education.

82. In the absence of the corrupt agreement to share the names of accepted students, Defendant Yale would have offered more acceptances, to a higher percentage of students like the named Plaintiff it interviewed.

83. The agreement by the Defendants to share the names of accepted students with each other is not justified by the need to precisely target the size and racial composition of the enrolled class. Less restrictive alternatives are available, specifically, admitting a larger number of students out of those interviewed.

84. Had Defendant Yale utilized the less restrictive alternative of admitting a larger number of students out of those interviewed, the named Plaintiff would have been offered an acceptance to Yale's medical school.

85. There is no adequate remedy at law to compensate the named Plaintiff for the loss of opportunity to obtain a medical education. There is no amount of money which can

compensate the named Plaintiff for the inability to achieve his dreams and career goals. The loss to the named Plaintiff and to society from the underutilization of the Plaintiff's extraordinary talents can only be mitigated and avoided by injunctive relief allowing the named Plaintiff to attend medical school at Yale.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against each Defendant as follows:

A. An injunction mandating Defendant Yale admit the named Plaintiff to its medical school:

B. An award to the name Plaintiff and class members of treble damages or profits, an incentive award to the named Plaintiff and reasonable attorneys' fees to the named Plaintiff as counsel for representation of the class, against all Defendants.

C. An award of prejudgment and post-judgment interest on any monetary award in this action, against all Defendants.

D. Such other and further relief as to this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims for which there is a right to jury trial.

Dated: November 20, 2017

SAMUEL PIERCE

By _[signature: Samuel Pierce]_
SAMUEL PIERCE (Maine Bar #005917)

SAMUEL PIERCE
Maine State Bar #005917
45020 Aviation Dr. #128
Dulles, VA 20166
*Plaintiff and Proposed Counsel for Proposed Class*
*USDC for the DC Bar Application Forthcoming*