| | |
|---|---|
| **SAMUEL PIERCE**, | |
| Plaintiff, | |
| v. | Case No. 17-cv-02508 (CRC) |
| **YALE UNIVERSITY, et al.**, | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiff Samuel Pierce wants to go to medical school. Denied admission by every school to which he applied, Pierce turned to the courts for a cure. He began by filing a federal lawsuit claiming that his rejection from Hofstra University's medical school was the result of intentional discrimination against "white Anglo-Saxon Protestant[s]." See Pierce v. Woldenburg, No. 11-cv-4248, 2012 WL 3260316, at *1, *3 (E.D.N.Y. Aug. 7, 2012). After that case was dismissed, Pierce unsuccessfully sued the University of California in state court, alleging he was denied admission to UCLA's medical school because of an "unlawful racial preference favoring Hispanics." See Pierce v. Regents of Univ. of Cal., B262545, 2016 WL 892015, at *4 (Cal. Ct. App. Mar. 9, 2016). Undeterred, Pierce filed this case asserting a single claim under the Sherman Act. A lawyer, but proceeding *pro se*,[1] Pierce here alleges that he was not admitted to the Yale School of Medicine both because he is a white Republican and because of an antitrust conspiracy between medical schools to share the names of successful applicants. The antitrust

---

[1] Although Pierce did not go to medical school, he did attend law school and is barred in Maine. See ECF No. 4 at 21.

conspiracy, Pierce contends, "enables" Yale and other schools to discriminate against otherwise worthy applicants like him who do not share Yale's purported ideological views.

Defendants have moved to dismiss Pierce's amended complaint for lack of standing and failure to state a claim. Defs.' Mot. to Dismiss ("MTD"), ECF 12-1. Soon after they filed that motion, Pierce moved to strike the discrimination allegations made in the complaint, to schedule oral argument, or, in the alternative, to transfer the case to the District of Maine. Pl.'s Mot., ECF No. 13. He has also moved for a scheduling order to allow limited discovery regarding his antitrust claim. Pl.'s Am. Mot. for Scheduling Order, ECF No. 20. For the reasons that follow, the Court will grant Defendants' motion to dismiss and deny Pierce's motions.

## I.    Background

As required on a motion to dismiss, the Court draws this factual background from the complaint, assuming the truth of all well-pled allegations. See Sissel v. U.S. Dep't of Health & Human Servs., 760 F.3d 1, 4 (D.C. Cir. 2014). Defendants—Yale University ("Yale"), the Trustees of the University of Pennsylvania ("Penn"), and the Association of American Medical Colleges ("AAMC") (collectively, "Defendants")—naturally dispute many of Pierce's allegations. MTD at 5.

Pierce claims that he is "a *magna cum laude* graduate of Penn's undergraduate program who earned perfect scores on the Medical College Admissions Test." First Am. Compl. ("FAC"), ECF No. 4, ¶ 6. He applied to a number of medical schools between 2009 and 2015 using AAMC's application system. Id. ¶ 36. Pierce was one of approximately 700 applicants selected to interview at Yale in 2015. Id. ¶¶ 6, 56. He was not, however, offered admission to Yale or any other school to which he applied. Id. ¶ 38.

Pierce raises a single claim under Section 1 of the Sherman Act, 15 U.S.C. § 1.  FAC ¶¶ 65–73.  He frames his complaint as a challenge to a conspiracy between medical schools, including Yale and Penn, and AAMC to share the names of successful applicants on the Multiple Acceptance Report ("MAR"), a list that Pierce says is circulated among schools during each application cycle.  Id. ¶ 2.  He identifies three anti-competitive effects of this alleged information-sharing conspiracy: (1) increased tuition because accepted students have less bargaining power to negotiate financial-aid packages; (2) decreased overall acceptances because schools are better able to anticipate matriculation rates and avoid over-enrollment; and (3) decreased consumer choice because schools are less likely to extend offers to students already accepted elsewhere.  Id. ¶ 4.  He insists that he would have gotten into the medical schools to which he applied, including Yale, if not for the MAR conspiracy.  Id. ¶¶ 6, 41.

Yet Pierce spends much of the complaint discussing another alleged cause of his rejection: "invidious" discrimination.  Id. ¶ 55; see also id. ¶¶ 30, 46–64.  Pierce alleges that Yale "stack[ed] the deck against persons of Plaintiff's race" (white) and political party (Republican).  Id. ¶ 66.  As evidence, he maintains that Yale seeks to achieve "thinly veiled, rigid racial quotas" and that "a Black applicant is far more likely to be admitted to medical school than a White applicant."  Id. ¶¶ 50, 53.  Pierce alleges that Yale also seeks to achieve "ideological uniformity," as demonstrated by statements on its website expressing support for the Affordable Care Act ("ACA").  Id. ¶¶ 57–58.  AAMC likewise exhibits "bias against Republicans," as indicated by an e-mail it circulated in June 2017, also expressing support for the ACA.  Id. ¶ 59.  Yale's bias was on display during his 2015 interview, Pierce says, when "he was interrogated . . . regarding his political preferences."  Id. ¶ 55.  He suggests that "Black and Hispanic applicants (who are assumed to share Yale's required [liberal] ideology)" were not similarly interrogated.  Id.

According to Pierce, this political and racial discrimination led Yale to reject his application despite his "extraordinary talents," id. ¶ 71:

> A separate admissions track applied to the Plaintiff where [he] was expected to produce incontrovertible evidence that he had no inklings of support for the Republican Party or any ideas associated with it, which did not apply to any Black applicants. The Plaintiff could not do so. Shortly after interviewing . . . , Yale informed Plaintiff that it was denying Plaintiff admission to the medical school.

Id. ¶ 55. Pierce broadly alleges that the MAR "enables this sort of political and racial discrimination" because without access to the information on that report, "market forces [would] constrain the ability of universities to exact retribution on the Plaintiff (and others demographically similar to him) for the perceived sins of his ancestors." Id. ¶ 56. To support this assertion, Pierce spins out a "mathematical model" in his complaint which estimates that, absent the MAR, Yale would have to more than double the number of students it admits in order to achieve its target class size. Id. ¶ 41. Under this model, Pierce contends that Yale "would have necessarily admitted" him had it not received the MAR. Id. ¶¶ 6, 41.

## II.  Standard of Review

Defendants move to dismiss the complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). When analyzing a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the "court assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor, but is not required to accept the plaintiff's legal conclusions as correct." Sissel, 760 F.3d at 4 (citation omitted) (Rule 12(b)(6)); Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (Rule 12(b)(1)). To survive a 12(b)(1) motion, a complaint must state a plausible claim that the elements of standing are satisfied. See Humane Soc'y of U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015). And to

survive a 12(b)(6) motion, the complaint must contain sufficient facts that, if accepted as true, state a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Where a *pro se* plaintiff drafted the complaint, the Court construes the filings liberally and considers them as a whole before dismissing. See Schnitzler v. United States, 761 F.3d 33, 38 (D.C. Cir. 2014).

## III. Analysis

Defendants move to dismiss the amended complaint on three grounds. First, they assert that the Court lacks subject matter jurisdiction under Rule 12(b)(1) because Pierce lacks Article III standing. Second, they maintain that Pierce has failed to state a claim under Rule 12(b)(6) because his allegations are noncommercial in nature and therefore fall outside the scope of the Sherman Act, and because the alleged conspiracy is implausible on its face. And third, they argue that the complaint must be dismissed because well-established principles of academic deference prohibit the Court from granting Pierce the specific relief he seeks, which is admission to Yale Medical School.

The Court begins with standing. While Defendants raise only Article III standing as a basis for dismissal, plaintiffs in antitrust cases confront two separate standing hurdles. In addition to constitutional standing, they must also satisfy the requirements of "antitrust" (or statutory) standing. Antitrust standing "asks 'whether the plaintiff is a proper party to bring a private antitrust action.'" Johnson v. Comm'n on Presidential Debates, 869 F.3d 976, 982 (D.C. Cir. 2017) (quoting Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983)). And in this case, that means whether Pierce has alleged an injury that "affect[s] [his] business or property" and is "the kind of injury the antitrust laws were

intended to prevent." Andrx Pharm., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 806 (D.C. Cir. 2001) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).

As will be explained below, the Court concludes that Pierce lacks antitrust standing and will dismiss his suit on that basis. Antitrust standing is not jurisdictional, however, at least in the constitutional sense. In re Lorazapam & Clorazepate Antitrust Litig., 289 F.3d 98, 108 (D.C. Cir. 2002) ("[J]urisdiction does not turn on antitrust standing." (citing Assoc. Gen. Contractors of Cal., Inc., 459 U.S. at 535 n.31)). It is properly considered under Rule 12(b)(6). Andrx Pharm., Inc., 256 F.3d at 804–05. So the Court is required first to assess Pierce's Article III standing before moving to non-jurisdictional grounds for dismissal. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998).

A. Constitutional Standing

Article III of the United States Constitution limits the reach of federal jurisdiction to the resolution of cases and controversies. See Dominguez v. UAL Corp., 666 F.3d 1359, 1361 (D.C. Cir. 2012). "[S]tanding 'is an essential and unchanging part of the case-or-controversy requirement,'" id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)), and "a necessary 'predicate to any exercise of [federal court] jurisdiction,'" id. (quoting Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc)). Accordingly, "[e]very plaintiff in federal court bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability." Id. (quoting Lujan, 504 U.S. at 560–61). At the motion to dismiss stage, "plaintiffs must plead facts that, taken as true, make the existence of standing plausible." In re Sci. Applications Int'l Corp. Backup Tape Data Theft Litig., 45 F. Supp. 3d 14, 23 (D.D.C. 2014) (hereinafter "SAIC"). This means Pierce must plausibly plead that his alleged injury (rejection by Yale) is both "fairly

traceable" to the challenged conduct (the information-sharing conspiracy) and "redressable" by the relief he seeks (admission to Yale).  See Sierra Club v. Jewell, 764 F.3d 1, 8 (D.C. Cir. 2014).

Pierce has plausibly alleged a "concrete and particularized" injury: he was rejected by Yale.  See Lujan, 504 U.S. at 580.[2]  A closer question is whether he has plausibly alleged that this injury is "fairly traceable" to the challenged conduct.  See id.  He alleges that sharing of the MAR leads to artificially low acceptance rates by enabling medical schools to more accurately anticipate matriculation rates and avoid over-enrollment.  FAC ¶ 4.  It also decreases consumer choice, Pierce claims, because schools are less likely to admit a student already admitted elsewhere.  Id.  According to Pierce, Yale's ability to accept an artificially low number of students explains why he was rejected.  Id. ¶ 56.

Defendants respond that Pierce lacks standing because he has alleged another, more direct cause of his rejection from Yale: discrimination against his ilk.  See, e.g., FAC ¶¶ 55, 60. By including these allegations of discrimination in the complaint, Defendants say, Pierce "has pled facts (if taken as true) unequivocally establishing that he was denied admission for reasons wholly unrelated to the alleged antitrust conspiracy."  MTD at 10.  But Defendants misread the amended complaint and misapply the relatively low standard of causation that governs at the pleading stage of a case.

_____

[2] As explained above, Pierce identifies another injury caused by the use of the MAR: an increase in tuition costs by reducing admitted students' bargaining power over financial aid. FAC ¶ 4.  *Pierce*, however, has not suffered this injury because he has never been admitted to medical school and thus has never been in a position to bargain over tuition.  Accordingly, this section focuses only on Pierce's other theory: that sharing of the MAR causes a decrease in the number of admitted students, which led to his rejection from Yale.

The Court reads Pierce's complaint as alleging two independent causes for his rejection from Yale. He claims that his credentials qualified him for an admissions interview but after the interview revealed his political leanings, Yale denied him admission because he was a white Republican. FAC ¶ 55. Defendants are obviously correct that Yale's purported individual discrimination against Pierce does not implicate the antitrust laws.

But Pierce also alleges that sharing of the MAR separately caused his rejection by *enabling* Yale to discriminate against him. See id. ¶ 56. Without the MAR, he claims, "market forces" would have required Yale to base its admission decisions solely on quantitative factors unrelated to his race or political party. Id. Yale likely would have "foregone the interview process" entirely, he asserts, because it would have been forced to admit everyone, including him, who was deemed sufficiently qualified by those measures to be offered an interview. Id. In other words, Pierce alleges that if Yale had not received the MAR, it could not have discriminated against him and would have been forced to admit him. Viewed in this light, Pierce's "market forces" theory of causation operates as an alternative alleged cause of the injury he asserts.

That Pierce's oft-repeated complaints of racial and viewpoint discrimination may be the more direct (and easily described) causal explanation for his rejection does not defeat his constitutional standing at this stage of the litigation. A plaintiff seeking to establish Article III standing is not required to identify "the most immediate cause, or even a proximate cause, of [his] injuries." Attias v. CareFirst, Inc., 865 F.2d 620, 629 (D.C. Cir. 2017). He need only show that the alleged injury is "'fairly traceable' to the defendant." Id. (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1391 n.6 (2014)). And, at the pleading stage,

he must simply allege facts that plausibly support the proffered causal connection.  SAIC, 45 F. Supp. 3d at 23.[3]

Pierce has shouldered that relatively light burden.  The logical progression of his "market forces" theory can be restated as follows:  By knowing which applicants other medical schools have admitted, Yale is better able to predict which students will accept its offers of admission.  That ability, in turn, allows Yale to admit fewer students to generate its target class size of approximately 80.  The process leads to the exclusion of other qualified candidates, including Pierce, that Yale would have been forced to admit but for its access to the MAR.  And the number of these otherwise qualified candidates would be so large (400 to 500 students, according to Pierce's "mathematical model") that Yale would not have been able to discriminate individually against any one applicant.  See FAC ¶ 41.

There are a host of problems with Pierce's theory to be sure.  For starters, his contention that Yale would have to admit upwards of 500 additional students strikes the Court as highly conjectural.  And Pierce's model assumes, counterintuitively, that Yale would select its classes based purely on quantitative metrics alone, as opposed to a range objective and subjective criteria that Pierce may not satisfy.  Furthermore, even if Pierce is correct that barring the MAR

_____

[3] Defendants cite Johnson v. Commission on Presidential Debates, 202 F. Supp. 3d 159 (D.D.C. 2016), aff'd 869 F.3d 976 (D.C. Cir. 2017), and Cheeks of North America, Inc. v. Fort Myer Construction Corp., 807 F. Supp. 2d 77 (D.D.C. 2011), aff'd 2012 WL 3068449 (D.C. Cir. 2012) (per curiam), for the proposition that Pierce lacks standing because he has alleged a more direct cause of his injury than the antitrust violation.  See MTD at 11.  But neither case is on point.  In Johnson, the court found that the plaintiffs lacked standing because their alleged injuries "occurred before" the alleged antitrust conspiracy and thus were not fairly traceable to the defendants' subsequent conduct.  202 F. Supp. 3d at 169 (emphasis in original).  The court identified a similar problem in Cheeks, where the alleged bid-rigging conspiracy could not have injured the plaintiffs because they had failed to comply with various requirements to even participate in the bidding process.  807 F. Supp. 2d at 92.  Here, by contrast, Pierce suffers no such timing problem.

would lead to more offers of admission, he does not explain why Yale still couldn't practice the invidious discrimination he alleges by simply interviewing more applicants and continuing to weed out white Republications like him. If it could, that might eliminate "market forces" as an independent cause of his injury. These problems are mostly factual, however. And as unlikely as it may seem that the facts would ultimately bear Pierce's theory out, the Court hesitates to say that he has not "plausibly" traced his rejection to the alleged MAR conspiracy. Pierce has therefore satisfied the causation prong of Article III standing at this stage of the litigation.[4]

B. <u>Antitrust standing</u>

Having satisfied itself that Pierce has plausibly alleged Article III standing at this stage of the case, the Court may now move to antitrust standing.[5]

Again, to have standing to bring an antitrust claim, Pierce must allege an injury that "affect[s] [his] business or property" and is "the kind of injury the antitrust laws were intended to

---

[4] A few words on redressability. Defendants contend that the Court, in deference to established principles of academic independence, should not grant Pierce the sole explicit relief he seeks: an order requiring Yale to admit him. Defendants do not couch this argument in terms of standing. But it would appear to implicate the redressability requirement of constitutional standing—if the Court cannot give Pierce what he wants, then how can it redress his injury? The answer is that, even if academic deference counsels against ordering Yale to admit Pierce, the Court could still issue an order declaring that the circulation of the MAR violates the Sherman Act. If the Court were to so rule, Pierce presumably would be able to reapply to Yale and his other chosen schools. And if his theory of the case is correct, he would likely be admitted, or at least his chances of admission would increase. The Court's ruling would therefore be at least a step towards the ultimate relief Pierce seeks. That is likely sufficient to meet the redressability requirement of constitutional standing. <u>See Massachusetts v. EPA</u>, 549 U.S. 497, 525 (2007).

[5] Defendants do not assert lack of antitrust standing as a ground for dismissal. But the central inquiry here—whether the plaintiff has alleged an antitrust injury—is essentially the same one the Court would have to confront in resolving Defendants' argument that Pierce has failed to state a claim under the Sherman Act. <u>See</u> MTD at 12–14 (arguing that Pierce's rejection from Yale is not a commercial injury covered by the Sherman Act). Recent D.C. Circuit precedent suggests that the proper approach is to frame the issue in terms of statutory standing rather than failure to state a claim. <u>Johnson</u>, 869 F.3d at 982–83. So the Court will follow that lead.

prevent." <u>Andrx Pharm., Inc.</u>, 256 F.3d at 806 (quoting <u>Brunswick Corp.</u>, 429 U.S. at 489).

Pierce contends that the sharing of the MAR among medical schools resulted in two anti-

competitive effects: a reduction in the number of students admitted and an increase in tuition due

to diminished financial-aid bargaining power on the part of admitted students. Pierce has

suffered the first injury, but it is one that falls outside the reach of the Sherman Act. And while

the second injury may be the type the Sherman Act is designed to prevent, as noted previously,

Pierce has not suffered it.

The Sherman Act applies only to conspiracies that restrain "trade or commerce." 15

U.S.C. § 1. Thus, "section one of the Sherman Act regulates only transactions that are

commercial in nature." <u>United States v. Brown Univ.</u>, 5 F.3d 658, 665 (3d Cir. 1993). Starting

with Pierce's first alleged injury, decisions by academic institutions about which and how many

students to admit are noncommercial and therefore not covered by the Sherman Act. <u>See</u> <u>Selman</u>

<u>v. Harvard Med. Sch.</u>, 494 F. Supp. 603, 621 (S.D.N.Y.), <u>aff'd</u> 636 F.2d 1204 (2d Cir. 1980)

("Academic admissions criteria . . . . are [] non-commercial in nature. The Sherman Act was

certainly not intended to provide a forum wherein disgruntled applicants to medical school could

challenge their rejections."); <u>Donnelly v. Boston College</u>, 558 F.2d 634, 635 (1st Cir. 1977) (per

curiam) (holding that law schools' admissions practices "do not have 'commercial objectives'"

(quotation omitted)); <u>see also</u> <u>Marjorie Webster Jr. College, Inc. v. Middle States Ass'n of</u>

<u>Colleges & Secondary Sch., Inc.</u>, 432 F.2d 650, 654 (D.C. Cir. 1970) ("[T]he proscriptions of the

Sherman Act were tailored for the business world, not for the noncommercial aspects of the

liberal arts and the learned professions." (citations and internal alterations omitted)). Yale's

decision to reject Pierce therefore cannot support antitrust standing.

Granted, Pierce challenges not only his specific rejection, but also the process by which Yale arrived at the number of students to admit. But that does not convert his injury into a commercial one. The asserted injury is still his rejection, which remains noncommercial whether it resulted from the caprice of an admissions officer or the calculus Yale used to set its admissions targets. Cf. Marjorie Webster, 432 F.2d at 654 (holding that process of accrediting schools "is an activity distinct from the sphere of commerce; it goes rather to the heart of the concept of education itself").

This is not to say that academic institutions cannot engage in commercial conduct implicating the Sherman Act. In United States v. Brown University, 5 F.3d 658 (3d Cir. 1993), for example, the Third Circuit held that setting financial aid was a "commercial transaction" related to charging tuition. Id. at 668. And a judge of this court held in Jung v. Association of American Medical Colleges, 300 F. Supp. 2d 119 (D.D.C. 2004), that the medical school residency match program was commercial in nature due to its effects on resident physician compensation *following* medical school. Id. at 173–74. Tellingly, both courts contrasted the practices at issue in those cases with "distinctly noncommercial" academic functions like medical school admissions and college accreditation. See Brown, 5 F.3d at 667–69 (citing Marjorie Webster, 432 F.3d at 654); Jung, 300 F. Supp. 2d at 170 (citing Selman, 494 F. Supp. at 621).

This brings us to Pierce's second alleged anti-competitive consequence of sharing the MAR: increased tuition due to reduced financial-aid bargaining power. While cases like United States v. Brown University might support antitrust standing based on that alleged injury, the rub for Pierce is that the alleged lack of bargaining power only affects students who are admitted to

Yale.  It is entirely irrelevant to Pierce, who has never been admitted to medical school and thus has never been in the position to bargain over financial aid.

Accordingly, the Court finds that Pierce has not alleged that he has suffered the type of injury that the Sherman Act is designed to prevent.  He therefore lacks antitrust standing, and the Court will dismiss the amended complaint on that basis.  The Court need not reach Defendants' argument that dismissal is independently required because courts should not second guess admissions decisions by academic institutions.

C.  Other pending motions

The Court will also deny Pierce's "offer" to transfer the case to the District Court for the District of Maine.  See Pl.'s Mot. at 5–6.  The Court "may transfer any civil action to any other district or division where it might have been brought" for the "convenience of parties and witnesses, in the interest of justice."  28 U.S.C. § 1404(a).  As the movant, Pierce must demonstrate that venue is proper in the District of Maine and that it is in the interest of justice to transfer the case there.  Stewart v. Azar, 308 F. Supp. 3d 239, 244–45 (D.D.C. 2018).  Under 28 U.S.C. § 1391(b)(2), venue is proper where "a substantial part of the events or omissions giving rise to the claim occurred."  Pierce represents in conclusory terms that "a substantial portion of the events in the conspiracy at issue, namely the victimization of medical school applicants resident in the State of Maine by this scheme, occurred in [Maine]."  Pl.'s Mot. at 5.  He fails, however, to identify any of these applicants.  Even if his assertion were sufficient to establish that the case might have originally been brought in Maine, it appears that, contrary to Pierce's representation to the Court that he seeks to transfer the case for convenience, id., his true motivation is inappropriate forum shopping.  See Defs.' Opp'n Ex. B, Email from S. Pierce to Defense Counsel (May 3, 2018 at 10:22 AM), ECF No. 14-2 ("I am considering refiling in a

different district (seeing as my uncle is best friends with one of the 1st Circuit Judges, I think I would be able to defend any ruling there . . . .)").

Finally, because the Court will grant Defendants' motion to dismiss, Pierce's request for a hearing and his amended motion for a scheduling order and discovery plan are denied as unnecessary.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss and deny Plaintiff's "Motion to Strike, to Transfer, to Argue, & to Extend" and "Amended Motion for Scheduling Order and Proposed Discovery Plan."  A separate Order shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>January 10, 2019</u>